Case in our call this morning is agenda number eight, case number 107-975, People in the State of Illinois v. Raymond Johnson. Juan Bowman. Thank you. You may proceed. Thank you. Good morning. May it please the court, counsel. My name is Melissa May and I represent the appellant, Raymond Johnson, in this case. We're here today because the defendant's petition for leave to appeal presents two very diverse issues that need to be resolved by this court. The first issue involves the defendant's Fourth Amendment constitutional rights to be free from unreasonable searches and seizures. This issue can be divided, of course, into several subparts, involving first the threshold inquiry regarding whether the defendant had standing to call into question the validity of the search of the vehicle that he was in when the police searched the vehicle without the consent of the driver. Second, this issue deals with the police escalation of the detention of the defendant under Terry principles from a lawful Terry stop in question to a full-blown seizure. Third, we address the impact of the recent Supreme Court rulings in Arizona v. Gant on the propriety of the search of Mr. Thomas' vehicle. Now, the second issue that we're here to address today is completely unrelated to the Fourth Amendment issue and involves the split in the districts regarding whether unlawful possession of a weapon by a felon, which is a class three offense with an enhanced longer potential sentence, is a lesser or greater offense than the offense of aggravated unlawful use of a weapon by a felon, which is a class two offense with a standard maximum seven-year sentence under One Act, One Crime principles. With the court's permission, I'd like to address the Fourth Amendment issues first and then, as time permits, address the One Act, One Crime issues involved here today. The third district erred in determining that the defendant's detention was proper under Terry in this case. Under case law and statute, Terry provides that if police have a reasonable articulable suspicion that a person may be involved in, has committed or will commit a crime, they can stop that person under the statute, ask them for identification, for their name, for their address, and question them regarding what their activities are. If at that point in time their reasonable articulable suspicions increase that criminal activity has been ongoing, then the police can continue to question until they're either satisfied, probable cause arises, or nothing happens in which case they should be allowed to release whoever is being questioned. In this case the defendant is contending that the initial stop, which occurred at 3 o'clock in the morning, what had happened initially was that there had been a shooting in an area in Peoria, and police officers had come to the scene, one officer had spotted the vehicle in which the defendant had been a passenger at a place called the Friendship House, which was near, it's not clear from the record whether it's a couple houses or a couple blocks away from where the shooting took place, they spotted this vehicle as it was pulling out of the Friendship House and drove over to the Taft Homes. The vehicle did not commit any traffic offenses, and when Officer Hanley stopped the vehicle, he did not activate his lights, he didn't pull it over as a traffic stop, he waited until the vehicle had been parked, and then when the vehicle was parked and the two men exited the vehicle, he then shined a spotlight on the vehicle and began questioning about 25 feet from where the vehicle had been parked, began questioning the men about their names, what they were doing in the area, were they aware of the shooting, and at this point in time the defendant and the driver both continually cooperated with the police up until the point in time that the police asked the driver for consent to search the vehicle. During that conversation, did Officer Hanley express any belief or establish any reason for the continuing holding of these defendants? No, Your Honor, he did not. It appears from the activities that occurred that everything that these particular gentlemen did in response to police questioning was cooperative. Their answers were described by the state's brief as being nonviolent, and they were not. They were not vague or being unspecific, but it's not clear that they were specifically asked anything other than what they were doing in the area, were they aware of a shooting. One gentleman responded specifically that he works for Caterpillar and does not get involved in criminal activity, and the defendant responded that he was in the area visiting somebody, possibly a girlfriend, and so none of this gave them any reason to increase the suspicion that these gentlemen were involved. At the point in time that the police officers stopped these gentlemen and began asking them for their name, address, and why they were in the area, and if they were familiar with the shooting, the defendant does not contend at this point in time that the police actions were improper. Indeed, the police actions basically complied with the fact that at this point in time that they asked the driver for consent to search the vehicle, which he refused, which of course he has a right to do. When the driver refused consent to search the vehicle, at that point in time the defendant and the passenger, the defendant who was the passenger and the driver were both taken to squad cars approximately 50 feet away from where the car was parked, handcuffed, secured in separate squad cars. By this point in time there were four officers on the scene who were involved. At this point in time, Lieutenant Adams, who had arrived on the scene, ordered Officer Hanley to search the vehicle. It's interesting that at the suppression hearing when Officer Hanley was asked about the search, he did not say that he felt that he had a reasonable basis for the search. He simply backed away from that and said that he searched the vehicle because his boss told him to. Whereas Lieutenant Adams, who was the boss on the scene, basically said that he thought that this was an exception to the probable cause rule, although he didn't articulate what exception he thought that might be. Now at this point in time the police improperly escalated this Terry stop into an improper detention and a seizure, because the knowledge that they had at this time was that there had been a shooting nearby, and they saw an explorer driving away from a business area, and they claimed that the defendant and the driver were nervous when they were encountered by the police. They didn't have any idea of who was involved with the shooting. They didn't have any idea of the number of people who might have been involved with the shooting. They didn't have a description of the assailant. They didn't know whether the assailant was on foot or in a vehicle. They didn't know whether there was one shooter or two shooter, whether the shooter knew the victim. And so there was basically no purpose for them to bring the shooter or bring the defendant, at this point in time, to the scene. So they didn't get any kind of probable cause that this defendant passenger had been involved in this altercation. The defendant and the driver also didn't behave suspiciously at the stop. While it's articulated that they drove from the scene quickly, it's clear that they didn't drive from the scene quickly enough to violate any speeding laws. They didn't violate any other traffic offenses. And Officer Hanley merely followed them to where they parked their vehicle. He did not activate his sirens or activate his emergency lights when these gentlemen were finally, when they finally stopped. Also they stopped of their own accord. So that makes this case basically analogous to a classic Terry stop, as opposed to a traffic stop where you've got probable cause based on a traffic offense, and then the defendant, the stop escalates into a basis for a search based upon conduct of the defendant, and then a basis for probable cause. Here there was no basis of probable cause to stop. The only purpose of the stop could have been under Terry. And once the gentleman cooperated with the police, their basis for continuing the Terry stop became improper. It doesn't show that these gentlemen were fleeing the scene. It doesn't show that they fled the police officer when the officer shined the spotlight and offered and began their search. They did stop. They did cooperate. They explained why they were there. They said they didn't know anything about any shooting. And it was only after the driver was refused consent that these gentlemen were handcuffed and separated and placed in squad cars approximately 50 feet away from the Explorer. At that point in time, the officers conducted a search of the vehicle, which the third district characterized as a protective sweep, and basically found contraband underneath the passenger seat, which led to the defendant being arrested and taken to the police station where he gave inculpatory statements. Basically, he did not disavow his ownership interest in the gun, and he did not say, and he exonerated the driver. The driver was not charged in this case. And it's clear under constitutional underpinnings that the driver's refusal to give consent can't be the basis for increasing the suspicion, thereby giving the police a basis for searching the vehicle. Up until this point in time, the defendants and the driver's actions have actually decreased the reasonable articulable suspicion that they were involved in the shooting up until the time that the driver refused consent. Since there was no escalation of a reasonable articulable suspicion, the defendant contends at this point in time he should have been released. Since there was no escalation of a reasonable articulable suspicion, the defendant contends at this point in time he should have been released. Since the actions of the drivers and the actions of the defendant didn't escalate to the extent that it gave the officers probable cause to continue to detain, they also should have been released. There was no exception here to the probable cause requirement. There was no warrant. This is not a case of the Carroll Doctrine, and they did not have consent or any exigent circumstances that would have justified a search. Also, it's clear from the Fourth Amendment that warrantless non-consensual searches are per se unreasonable unless they fall within one of the well- established exceptions. And the State in this case denies that the defendants and the driver were involved in the shooting up until the   defendant and the driver were arrested at the point in time that the search occurred. The defendant, of course, contends otherwise, being as he was locked in a squad car, handcuffed, he was away from the vehicle, and no reasonable person under those circumstances at 3 o'clock in the morning, surrounded by four police officers, would have felt that he was free to terminate the encounter with the police. Even if this Court finds that the search was proper under Terry, the defendant has standing to contest the search. Now, the Third District, in its opinion, didn't address the issue of whether the defendant had standing or not to contest the search. However, under the cases of United States v. Durant, People v. Kunath, Legrone, and Manky, it's clear that a defendant who has been impermissibly seized with his own personal Fourth Amendment rights have been violated, does have standing to contest the search of the car. In the underlying case at the suppression hearing, the circuit court basically took the position that the defendant, this search was an invalid search. There's no argument that's been made that the search was a legal search, that this search was a constitutional search, and the circuit court specifically stated that had the attorney who represented the driver, had the attorney who represented the driver not represented the driver as opposed to the passenger in this case, he would have granted the suppression hearing. He would have granted the motion to suppress the handgun. And the only reason that he found that the evidence could be admissible was he based it upon an improperly broad misreading of Rackus v. Illinois, where the state contended that Rackus v. Illinois stood for the proposition that a passenger doesn't have a possessory interest in a vehicle, therefore he doesn't have standing to contest any search of that vehicle. And that's actually a very broad reading of Rackus v. Illinois. Rackus v. Illinois actually stands for the position that if a passenger is in a car, and he's a typical passenger, a typical temporary passenger situation, it's not likely that he's going to have a possessory interest or an expectation of privacy in, for example, the glove box or the trunk or under the seat of the car. But what this doesn't take into account that the passenger does not check his constitutional Fourth Amendment rights at the curb as soon as he gets into somebody else's car. A passenger, for example, could get into a car, place his wallet in the glove box or a duffel bag in the trunk, or in this case he placed his own gun under the front seat of the car, and thereby open up the question for inquiry as to whether he availed himself of different parts of that car to the point that he might have an expectation of privacy or a possessory interest in that car sufficiently. So it's not sufficient to warrant the court at least calling into question whether he had standing to contest the impermissible search. Does it make a difference whether this is a traffic stop or a terror stop? I think factually it makes a difference in this case simply because there's no likelihood in this case that the defendant would have gone back to the vehicle. Presumably it's not his car, so he doesn't have a possessory interest for purposes of going back to the vehicle. It's assumed that he's going to be driving away. Or he stopped at a traffic stop, they're going to issue a ticket, they're going to let him back into the vehicle, and it's assumed that he's going to be driving away. At that point in time it's a little bit different situation. Here the defendant was a passenger in the car, the car was stopped, the car belonged to somebody else, presumably the car was locked, and he was walking away, he was about 25 feet away from the car, telling the officers he was going to visit somebody in Taft Homes when the stop occurred. So I don't think that under the facts of this case, the fact that it was a traffic stop or a terror stop doesn't have any bearing disfavorably to our client, because of the fact that it's not likely under his circumstances that he would have regained access to the car, thereby regaining access to the weapon and endangering the police officers in any way. At which point did the defendant make the inculvatory statements? After he was, after the handgun was found, the defendant was taken to the police station, they ran tests on the casings that were found at the scene, determined that the casings at the scene, which was a couple blocks away, matched the gun that was found, and then they confronted the defendant in an interrogation, and at that point in time he admitted that the gun was his and that he was involved in the shooting, and claimed basically that he acted in self-defense. How much time are we talking about? It's not clear from the record exactly how much time that was. There's no testimony that indicates whether that was an hour or several hours or how long that took. Was there ever a suggestion before he was taken to the police station that he would be free to go? No, there was never any suggestion that he would be free to go. He didn't ask if he was free to leave, but Officer Hanley specifically testified that at the time he was stopping and questioning these gentlemen, immediately they were not free to go. There would be no issue of officer safety on that grounds? No, no. I'm not sure I was clear when you were talking about the defendant walking away from the car, how that played into the situation, the possessor interest, the expectancy of privacy, or if it did at all. And if it does, is there a point in time when it would have been that he was left so far that he has no standing at all to challenge the search to somebody else's car where he left some property? I think there would be a question of fact that any given case would have a different outcome. If, for example, he's exited the car, gone into the house, and the car's driven off and gone somewhere else, I think it's clear under those circumstances he wouldn't have an expectation of privacy in that vehicle. And the State argues here that he did walk away from the car, there was no arrest in the car, it was a tarry stop, and that if he had any expectation or any possessory interest, he abandoned that. Is that correct? That's correct. That's what the State's position is. Very quickly, to get to the one act, one crime issue that's involved, the defendant basically takes the position that unlawful possession of a property is a serious offense. First, it carries the maximum possible sentence, and from a defendant's perspective, that's going to be the most serious offense. Second, it recognizes the General Assembly's authority in sentencing issues. It's clear that the legislature has the responsibility of determining which is the most serious of offenses, and within that authority, the General Assembly also has the right and ability to take, for example, a Class III felony and provide an enhanced sentence. We've got a split in the districts right now between the first and the third districts, basically, that say what factors trial courts need to look at and what factors appellate courts need to look at to make a determination as to which is the more serious offense. The third district took the position that just look at the felony classification and that should pretty much be dispositive of the issue, since the felony classification is usually going to carry the greater offense or the greater sentence. That doesn't take into account the facts that are in this case, in which the defendant actually was facing a greater sentence for the offense of unlawful possession of a weapon by a felon, as opposed to aggravated unlawful use. And this is not a unique situation. There are many driving under the influence offenses and criminal sexual assault offenses that carry enhanced sentences greater than the standard Class II or Class III sentence that's provided under the statute. Sometimes this is a function of how often the offense has been committed before or what occurs in the particular offense or is, in this case, the status of the defendant as a felon. And I think it's important to note that this Court recently decided in Artists, People v. Artists, that looking at an aggravating factor is not something that the Court should be looking to to make a determination of which is the more serious offense. And if you look at the elements of these two statutes, in aggravated unlawful use of a weapon by a felon, the felony status is an aggravating factor that elevates this offense. It elevates the offense from a Class IV to a Class II. Whereas in unlawful possession of a weapon by a felon, it's actually an element of the offense, and it basically holds the position that that offense should be more serious because any felon possessing any weapon at any time is facing a maximum 10-year sentence under the unlawful possession offense, whereas under the aggravated unlawful use offense, a felon who is, for example, carrying an uncased firearm off his property is facing a maximum seven-year sentence. So based upon the maximum sentence involved, it appears that the legislature intended that unlawful possession of a weapon by a felon was the more serious offense. And if this Court has no further questions, thank you. I have one question, if I may. In this case, the sentences were the same, seven years on each one of them. Correct. And so it really makes no difference to the defendant except what kind of a sentence or what kind of a record he carries forward, is that correct? Or is the defendant's interest in having the class, he would rather have a class three felony carried on his record as opposed to a class two? Well, I don't think that you can look at the actual sentence that was imposed in any particular case to make the determination of which offense that the General Assembly considered to be the more serious. And so under these circumstances, while, you know, it's arguable whether he would prefer a class three or a class two, it's, he received a maximum sentence on one and a non-maximum sentence on the other. Even though they're concurrent and even though they're the same sentence, I think that this Court can exercise its authority to provide some guidance and give appellate courts and lower court, circuit courts, some idea of what factors they need to look at. Well, it doesn't make any difference to the defendant in this case, is it just for guidance? Yes, yes, Your Honor. Thank you. Good afternoon, Your Honors. May it please the Court. Ms. May, my name is David Iskowich. I'm with the Illinois Attorney General's Office on behalf of the people of the State of Illinois. I think I'm going to take these issues with respect to the Fourth Amendment claim in the opposite order of my colleague. Our first theory in our brief is the issue of reasonable expectation of privacy. As my opponent explained, the appellate court declined to rule on that issue, although significantly the trial court did find, in denying the defendant's motions to suppress, that he did not have a reasonable expectation of privacy in the vehicle, such that Officer Hanley's search of that vehicle and discovery of the firearm under the front passenger seat implicated no Fourth Amendment concerns. This is a very fact-intensive case, and with respect to the expectation of privacy issue, I need to just briefly go over several very important facts. First, it's undisputed that there was no vehicle stop here, or traffic stop. The defendant was followed a very short distance from the vicinity of a very recent shooting at 3 in the morning. Officer Hanley simply followed him into the parking lot of a structure known as Taft Homes. The defendant actually backed into a parking space, and he and the driver, Thomas, exited the car, and started walking away from the car. It's at this point only... Is there any connection between these defendants having exited the car and the shooting that occurred some distance away? Well, if connection, Your Honor, means whether the officer had reasonable suspicion that there might have been a vehicle stop, there might have been some connection. Yes, there was, in the officer's mind. The vehicle had been seen in a place which was about two or three houses down on a street parallel to the scene of the shooting. This place is called Friendship House, and it's a Salvation Army-type ministry. He saw them getting into the car, and then immediately turn around and drive in the opposite direction of the shooting. And that triggered in his head a reasonable suspicion that these two individuals seen leaving at a fast pace. from the scene of a recent shooting, might be involved in... What do you mean by fast pace? Officer Hanley testified that he didn't testify that they were speeding over the limit. He testified that they were driving fast away from the scene. Our appellate court has held in... So seeing them enter a car and driving in the opposite direction was the sufficient connection? Within seconds after the shooting had occurred, Your Honor. Officer Hanley approached the scene of the shooting and saw these two gentlemen enter the car and leave. There was no one else around. The business was closed. How did the officer become aware of the shooting? He received a dispatch over his police radio, Your Honor. That's a couple of seconds. Very short time. He was giving him a ticket on a bridge in Peoria, which was about six blocks away at the time. Processing of writing the ticket? He was processing a ticket. And when he heard this, he dropped what he was doing and proceeded immediately to the scene of the crime. He did not complete the writing of the ticket? I'm quite sure that he dropped what he was doing and then proceeded right to the scene. And at that point saw a white Ford Explorer with two individuals enter it in a closed business at three in the morning and drive away. That to him signaled a reasonable suspicion that... or had other information or were involved in some sort of criminal activity that was certainly afoot at that time in that neighborhood. So having followed them to the parking lot, the very first encounter that Officer Hanley has with these two individuals isn't the result of a pullover, traffic stop. He didn't curb their vehicle. He never even pulled up next to their vehicle. He parked some 50 feet away and put on his spotlight only for safety reasons and approached these two individuals as they were walking away from their car and asked if he could speak with them. They said yes. He checked IDs. He checked warrants. At that point he told them to stop and stand there. How did he check warrants? He told the two to stay put and he returned to his vehicle and ran the warrant checks. There's no indication in the record how long that took. We can surmise, however, it wasn't long because by the time he was doing that, Lieutenant Adams had arrived from the actual crime scene. And Lieutenant Adams testified that he went to the Hanley scene at the Taft Homes right after hearing Hanley's dispatch that he was going there having followed two guys. So he checked the record and he also called for backup? He called for backup and Lieutenant Adams came immediately. Lieutenant Adams is really the linchpin of our case here with respect to the Terry part of this. But just very briefly, having no reasonable expectation of privacy in this vehicle as he's not a passenger when it was stopped. He was a passenger recently, but there was no traffic stop. He was really walking around on the pavement at Taft Homes when he first encountered Officer Hanley. And our argument is that based on these facts, he had no reasonable expectation of privacy in that vehicle, such that the subsequent search violated any Fourth Amendment right that he might have had at that time. The defendant cites to Brendlin v. California, which does hold, we agree, that a passenger in a recently stopped vehicle has standing, not only to challenge the stop of the vehicle, but also any subsequent search of the vehicle and challenge evidence found in the vehicle as the fruit of the poisonous tree. But the facts in our case are off point from those in Brendlin, here again to emphasize there was no vehicle stop. The defendant wasn't a passenger and he didn't own the car. The underlying rationale in Brendlin is to... I have a question on that. You do dispute early in your brief that the defendant errs in relying upon traffic stop cases. But then later on, it appears you rely extensively on traffic stop cases, such as Michigan v. Long to argue that the police could properly search the defendant's vehicle pursuant to a Terry stop. So before you get into how the defendant is off base with these stop cases, I guess my initial question is, is there an inconsistency in arguing that the defendant cannot rely on stop cases, but then basing your own arguments on traffic stop cases here? I understand, Your Honor. If the brief wasn't as clear on this, I apologize. But that was an alternative argument, assuming that he did have a reasonable expectation of privacy in this vehicle. We argue as a second ground that the search of the vehicle was completely comported with the Fourth Amendment under Michigan v. Long. And so to the extent those are inconsistent, it's only because they're alternative arguments. The defendant makes much in her brief with respect to the real meat of this case, which is the Terry stuff. The defendant makes much about the contention that the seizure of the defendant occurred only after the officers on the scene learned that Thomas, the driver, who has never been implicated in any crime here, refused consent to drive the car. That statement doesn't find any record support. Although that is, in fact, when the defendant was seized and the car was searched. It's better to look at this case rather than in the vacuum of the Taft homes, but as in a more holistic approach that includes not only the Taft homes, but what was going on at the crime scene at Jefferson where there was a bleeding victim. And as I had said earlier, Lt. Adams really is the linchpin here. He brings these two crime scenes together and demonstrates that the investigation into this very recent shooting was ongoing and justified the continued detention of the defendant, even by cuffing him and putting him in a local squad car. Just before he left the scene at Jefferson where the shooting victim was laying, Lt. Adams testified that he had instructed his officers there to secure the scene, interview any potential witnesses, including the girlfriend of the victim, canvas the area for other physical evidence, and as soon as that evidence was forthcoming, broadcast that information over police radio. Did he also tell them to cuff at that point? It was at the scene at the Taft homes. Correct, Your Honor. So after instructing his officers in this way, he finds out that Officer Hanley has a couple of guys at the Taft homes who are of interest. He goes to the Taft homes, and it's at that point he assesses the scene, watches the pat-down, watches the identification check, and then instructs Officer Hanley to handcuff the two individuals and put them in the back seat of the squad car. This is the defendant's main point of contention here, but what the officers did was in full compliance with Terry Principles and Michigan v. Long, which involved the vehicle search. Not only was the investigation ongoing at this point, but the investigation was ongoing in very specific ways. All the officers were awaiting further information from the crime scene at Jefferson. It would have been irresponsible for the officers at this point to simply let these two individuals go about their way when very good inculpatory information could be forthcoming from the Jefferson scene, whereas I have described officers continue to investigate, interrogate witnesses, and search for physical evidence. On this basis, Lieutenant Adams made the judgment call that these two individuals, Thomas and the defendant, were still up in the air as far as ascertaining whether they were witnesses or the shooters or even victims themselves who might have run away from the scene. So it was justified in continuing the detention on this basis. Now, the handcuffing and the placing in the squad car was also completely justifiable under the circumstances. Not only was it 3 in the morning with two nervous suspects, but there had also been a recent shooting. Someone had actually been shot, and it was reasonable here for the officers based on their own safety concerns at this point in time to secure these two individuals in a squad car. Lieutenant Adams actually described in his testimony that he had to leave the scene immediately after... These facts were known to Officer Henley when he first stopped, when the defendants first exited their car. The facts regarding the... Nothing in the record suggests that anyone revealed a weapon. In the initial approach, no, Your Honor, he simply asked for identification and did a warrant check. Lieutenant Adams' arrival at the scene kind of changed things, though. He had already seen the victim, he had seen that the investigation was certainly not over, and by his very instructions was continuing with instructions to broadcast any information out on police radio. So when he gets there, he says, you know, I think it's a better idea to handcuff these guys and put them in the squad car. There's been a recent shooting, it's 3 in the morning, I have to leave. I'm going to be leaving two officers here. Officer Henley, I'm going to want you to do a search of the vehicle. Officer Buell, you're going to be watching these two guys on your own. I think he said he was going to have one guy, that is Officer Buell, watching these two individuals. Just to be safe, let's handcuff them and put them in the back of Officer Henley's squad car during the pendency of this search and the pendency of the ongoing investigation until we can find out more. Now, it's during that time that they also searched the vehicle. The vehicle search was completely acceptable under Michigan v. Long. In that case, the Supreme Court held that during a Terry stop, it's reasonable for officers to do a brief protective sweep of the interior of the vehicle so that any weapons that might be in there can't be used by individuals who, remember, are only detained under Terry, might very well be released and have access to that vehicle. So a Long search really is a safety-oriented search here. The defendant's reliance on Gant v. Arizona in this way is grossly misplaced. Gant, by its very expressed terms, did not overrule Michigan v. Long because it recognized that in the Terry case, the very real possibility exists that a suspect might be released pending the conclusion of the Terry stop. And for officer safety reasons, it's better practice to allow officers to do a very brief protective search of a vehicle before releasing those suspects. But at which point did Officer Henley receive the car keys from the defendant or the owner of the car? I don't know if there's anything in the record about him receiving any car keys. How did he enter the car? He entered the car by opening the door, but I don't know if it was locked or if he, there's nothing in the record indicating that he did anything else than go open the door. There's nothing in the record, in other words, that either the defendant or Thomas gave him a car key. He went and opened the door upon instructions from Lieutenant Adams and after the two individuals were secured in his squad car. So the suggestion that Gant changes the game here is misplaced. This wasn't a custodial arrest. This was a Terry stop, and under that rationale, the search of the vehicle for protective reasons was completely acceptable. The defendant, I'm sorry, Lieutenant Adams did testify at the suppression hearing, somewhat inartfully, that he believed he didn't, he had an exception to the probable cause rule to search that car. To the extent that the defendant has argued that that meant he went there to gather evidence rather than to secure the safety of his officers, has no relevance here as far as that's concerned. The United States Supreme Court has instructed in Wren and in Scott that an officer's subjective motivations play no role in ordinary Fourth Amendment analysis. And as long as there is one objectively reasonable and acceptable reason for an officer to take a certain action, there won't be any Fourth Amendment violation under those circumstances. So in sum, we have two crime scenes here, the Jefferson address where the victim is, the Taft homes. It was reasonable under these circumstances for the officers to discharge their duties diligently and in the utmost safety to detain these two individuals in a squad car and, because it's a Terry stop, perform a protective sweep of the nearby vehicle they had just exited. I beg your pardon, Your Honor? I misspoke, Your Honor. There's one crime scene, that's at Jefferson, where they find the victim. I misspoke, the Taft homes wasn't a crime scene, it was a scene where they encountered the defendant. So I say, I guess two scenes in this investigation would be a more artful way of saying that. Based on the circumstances that the officers encountered here, in the heat of the moment at 3 in the morning with the victim down, they acted reasonably in continuing the detention of these two officers while they awaited forthcoming information. And during the protective sweep, of course, they discovered a .22 caliber firearm under the front passenger seat, at which point they were provided with adequate probable cause to make a formal arrest. With respect to the sentencing issue, the appellate court found that the UPWF, or felony possession, was the less serious offense. And that the unlawful use of a weapon, which I'll call AUUW for short, was the more serious offense. Its reasoning was well grounded in this court's decisions in Artis and in Lee. In Lee, this court said that in comparing punishments under one act, one crime analysis, courts should look to the relative punishments conferred by statute. The appellate court in this case did just that. It looked at not only the felony classification, but it looked at the range, and the UPWF carries a higher end range and a lower end range than the AUUW, which carries a 3 to 7. UPWF is 2 to 10. But in a close case such as this, the appellate court took lead from this court's decision in Lee that looks to the relative punishments. It looked to the MSR terms. The MSR for UPWF is two years. I apologize. The MSR for UPWF is only one year. The MSR term for AUUW, the conviction that the people would like to keep, is two years. And also significantly, the UPWF conviction does not allow for any probation. I'm sorry, the UPWF conviction does allow for probation. The AUUW is not a probationable offense. In taking the lead from Gancars and Martinez, the defendant has deviated from the court's instruction in Lee that the court should look to the relative punishments. Gancars and Martinez, by contrast, simply look to the maximum term of punishment imposed by each statute. That's an overly restrictive approach that we think is contrary to this court's directives in Lee and Ortiz. It doesn't take into consideration the felony classification or any of these other considerations, such as the ability to have probation, the length and duration of MSR terms, these considerations that give a better picture of what the General Assembly intended, quote, the relative punishments, what the General Assembly intended for the statute at issue. And in line with this court's language in Lee, that the courts look to the relative punishments conferred by the statute, not just the maximum term set forth by the statutory authority. So we believe that the third district in this case was more in line with this court's decision in Lee and Ortiz. And the Gancars and Martinez, by contrast, provide a too restrictive approach to analyzing these one act, one crime questions. Unless this court has any further questions, the people request that the court affirm the judgment of the appellate court. Thank you very much. To address just a couple of the points that the state made in rebuttal, it's important to notice in this case that the standing issue of the defendant as far as the expectation of privacy in the vehicle was never ruled on by the third district. And it wasn't ruled on, it was ruled on at the circuit court level, but it was ruled on based upon an inaccurate reading of people v. Rackus. I think the better stand that the court should have done at that point in time was to make a determination since the defendant did have a possessory interest in the item that was seized, which gives him a basis for standing. And he had availed himself of the interior of the vehicle. A factual inquiry should have been made as to whether that defendant had standing to contest the search. To simply say that if this had been the driver, the motion to suppress would have been granted, but since it's the passenger, no, it's not going to be granted, basically opens up the concerns that were expressed by the Supreme Court in Brennan v. California, which is that if you've got an officer who's roaming around and they're looking for people to search and they come across vehicles that have more than one person in the vehicle, as long as any contraband that's seized in that vehicle can be attributed to the search, basically the officers are thereby getting a no holds barred card at that point in time that they are basically immune from contesting the constitutionality of the search. And this is exactly the kind of concerns that the Supreme Court said that it was addressing in Brennan v. California when it said that simply by saying somebody's a passenger in a vehicle, they thereby have no interest in any search that was conducted in that vehicle. It is a misreading of the Fourth Amendment. Another point I'd like to make is that in this case, the state argues that Adams brings the two scenes together, and I think Officer Adams is indeed a linchpin in this situation, because Officer, Lieutenant Adams, excuse me, basically took the position and did testify that he felt that he had an exception to the probable cause. Now, there's only a few exceptions to probable cause. One of those exceptions is consent, which clearly he didn't have. Another exception would be a search incident to arrest. If the state takes the position that this was an exception to probable cause, the only possible way they could go that route would be to say that this was a search incident to the arrest, and if it was a search incident to the arrest, then Arizona v. Adams would be sitting 50 feet away from the car, handcuffed and secured. And the state, of course, has not cited, nor are there any cases that we can rely on, where a handcuffed defendant sitting 50 feet away, secured in a squad car, has somehow managed to escape his bonds, go to a vehicle that doesn't belong to him, access a weapon and threaten officers. That's never occurred, and if it had occurred, I believe the state would argue that case very strongly. It's also inconsistent for the state to take the position that the defendant had no possessory interest in this vehicle. In other words, he doesn't have a possessory interest to contest the search, but he does have enough of an interest in that vehicle that we're going to be concerned about officer safety and him reaccessing the vehicle. And those are inconsistent positions. And so from that perspective, the state's arguments have to fail. The circuit court acknowledged that if this had been the driver rather than the passenger, the motion to suppress would have been granted. Both the circuit court and the third district failed to conduct a proper inquiry into whether this defendant had standing to contest the search. It's clear under these circumstances that the officers' contention that they were still trying to determine whether these people were victims or suspects or witnesses is specious. Because the fact is they asked the gentleman, did you know anything about the shooting? They said no. That clears up whether they thought they were witnesses. Clearly they weren't wounded, but they're not victims of the shooting. And so it appears that the state was just basically continuing to hold these people until they found something that was going to implicate them in this offense. Upholding the third circuit would send a message that as long as evidence seized can be attributed to the passenger, police officers are immune from constitutional challenges when they stop and search a car with more than one person in it. This is precisely the kind of actions that the United States Supreme Court determined was unacceptable in Brennan v. California. And if this court has no further questions, I will conclude my comments. In conclusion, I'd like to say that we would like to request that the defendant's conviction be overturned outright. And we'd also like to ask that the defendant's conviction for unlawful use of a weapon by a felon, aggravated unlawful use of a weapon by a felon, be vacated. Thank you.